## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------x
                                             :   Chapter 11
In re                                        :
                                             :   Case No. 14-10932 (____)
Quantason, LLC                               :
                                             :
            Debtor.                          :   Hearing Date: T.B.D.
                                             :   Obj. Deadline: T.B.D.
-------------------------------------------------------------x
```

**MOTION OF THE DEBTOR AND DEBTOR IN POSSESSION PURSUANT TO
SECTIONS 105(A), 363 AND 365 OF THE BANKRUPTCY CODE FOR AN ORDER
(I)(A) APPROVING PROCEDURES IN CONNECTION WITH THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) SCHEDULING THE
RELATED AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE; (C)
APPROVING PROCEDURES RELATED TO THE ASSUMPTION OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING THE
FORM AND MANNER OF NOTICE THEREOF; AND (E) GRANTING RELATED
RELIEF; AND (II)(A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTOR'S ASSETS PURSUANT TO THE SUCCESSFUL BIDDER'S ASSET
PURCHASE AGREEMENT FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS; (B) APPROVING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES RELATED THERETO; AND (C) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor" or "Quantason")

hereby moves the Court (the "Motion") for the entry of an order pursuant to sections 105(a), 363

and 365 title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006,

9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rules 2002-1 and 6004-1 of the Local Rules Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "Local Rules") for an order (i)(a)

approving procedures in connection with the sale of substantially all of the Debtor's assets; (b)

scheduling the related auction and hearing to consider approval of sale; (c) approving procedures

related to the assumption of certain executory contracts and unexpired leases; (d) approving the

form and manner of notice thereof; and (e) granting related relief; and (ii)(a) authorizing the sale

of such assets free and clear of liens, claims, encumbrances and other interests, except as

provided in an Asset Purchase Agreement (as defined below); (b) approving the assumption and

assignment of certain of the Debtor's executory contracts and unexpired leases related thereto;

and (c) granting relief related relief.  In support of this Motion, the Debtor respectfully states as

follows:

## Jurisdiction and Venue

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.

This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28

U.S.C. §§ 1408 and 1409.

## Background

2.      On April 23, 2014 (the "Petition Date"), the Debtor filed with this Court a

voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is in

possession of its properties and continuing to operate its business as debtor and debtor in

possession under sections 1107 and 1108 of the Bankruptcy Code.   No trustee has been

appointed in this case.

3.      Quantason was incorporated in Delaware in 2009 and has its executive office in

Los Angeles, California.  It is a technology company focused on developing, licensing and

commercializing products utilizing its proprietary Image-based Dynamic Ultrasound

Spectrography ("IDUS")™ platform technology and systems for breast cancer screening and

prevention.  For breast screening, IDUS™ technology is being developed and investigated to

utilize automated and conventional ultrasound systems and to provide real-time, non-invasive

imaging, stimulating and response recording of targeted breast tissues for detection, 3-D

location and classification of high-risk lesions ("microcalcifications"), which are strong predictors of the presence of breast cancer.

4.      IDUS™ technology is designed and is being developed to enhance the 2-D and 3-D imaging capabilities of conventional ultrasound platforms by adding two important features: (i) real-time quantitative spectral analysis and (ii) 3-D positioning of microcalcifications. Quantason's objective is to develop a technology to provide an effective screening modality with higher detection sensitivity that results in an earlier finding of high-risk breast lesions.

5.      Quantason anticipates that the initial introduction of its IDUS™ technology will be in the context of :

- the integration of IDUS™ technology with conventional automated ultrasound systems with hands-free scanners as well as those with hand-held transducers for breast microcalcification detection, location, classification and precision guided biopsy; and

- the development of its IDUS™ module as a plug-in device for installed-base ultrasound platforms.

6.      The IDUS™ platform technology is protected by 18 issued and pending patents and several patent applications in the pipeline, for which Quantason is either the assignee or the exclusive and perpetual licensee. In addition, Quantason has two allowed trademarks. Quantason is the sole assignee of certain intellectual property rights and an exclusive and perpetual licensee from BioQuantetics, Inc. Quantason also has trade secrets, confidential information, data and know-how which support its activities in further advancing its IDUS™ platform technology.

7.   As a product development stage technology company, the Debtor currently has no products approved for sale in any jurisdiction. Thus, throughout its brief history of operations, it has unsurprisingly incurred significant operating losses as it incurred costs associated with:

- designing and conducting the human pilot studies and human clinical trials which may be required to obtain clinical validation and regulatory approval for certain applications of its IDUS™ technology;

- seeking regulatory authorizations and approvals in the United States and European Union for IDUS™ technology and systems;

- further research, product development, and third-party manufacturing efforts, including sensors and sensor-retaining disposables;

- growing, prosecuting, maintaining and protecting its intellectual property;

- expanding third-party manufacturing, sales and marketing capabilities or overseeing the compliance of outsourced activities; and

- broadening its infrastructure and operations.

8.   Given these conditions, in order to remain operationally solvent, the Debtor has been dependent on periodic infusions of capital from outside investors. In its brief history, the Debtor successfully has funded its operations in this manner through two (2) rounds of financing.

9.   In early 2013, the Debtor recognized the need for another round of investor financing and began pursuing such a course. To this end, the Debtor retained legal advisors with the intent of formally initiating the offering in late 2013 to raise at least $10,000,000 in an offering of its Class A and Class B Units to investors. The Debtor prepared a draft offering

memorandum and was confident that the offering would raise the capital necessary for the Debtor to continue operating effectively.

10.     The Debtor identified several potential institutional investors. The Debtor began contacting these parties in September 2013 and continued discussions with potential investors through January 2014.  In all, the Debtor had communications with approximately five (5) potential institutional investors, at least three (3) of which executed non-disclosure agreements with the Debtor and were given access to diligence materials.  Others also demonstrated great interest in participating in the offering.

11.     For a variety of reasons, however, the Debtor's existing unit holders could not reach agreement with respect to commencing the offering.  As the Debtor's cash situation became increasing dire, the existing unit holders went so far as to participate in a mediation on February 28, 2014.  When the mediation proved unsuccessful, given the Debtor's lack of cash, the Debtor was left with no alternative but to suspend its operations, terminate its employees, and, as agreed to by its unit holders following the mediation, file this chapter 11 case.

**Preliminary Statement**

12.     As discussed above, the Debtor is a technology company that was formed in 2009 for the purpose of developing, licensing and commercializing products utilizing IDUS$^{TM}$ platform technology and systems for breast cancer screening and prevention.  The Debtor has now reached the stage when it needs additional capital in order to continue with the development of its technology.  As discussed above, the Debtor has been unable to obtain the consent necessary to obtain a capital infusion from an outside investor.  Accordingly, the Debtor has determined that maximizing the value of the Debtor's estate is best accomplished through the sale, free and clear of liabilities, of substantially all of its assets (as described more fully herein, the "Purchased Assets").

13.     Given the Debtor's precarious financial position, the Debtor has not been able to engage in lengthy discussions and negotiations with prospective purchasers in an effort to select a stalking horse bid for the Purchased Assets.  In order to move the sale process along as quickly and efficiently as possible, the Debtor has drafted a purchase agreement (together with the schedules and related documents thereto,[1] the "Purchase Agreement"), a draft of which is attached as Exhibit 3 to the Bid Procedures Order (defined below),[2] pursuant to which the Purchased Assets will be sold to the Successful Bidder (defined below).

14.     The Debtor believes that the sale of the Purchased Assets pursuant to the procedures and on the timeline proposed herein presents the best opportunity to maximize the value of the Purchased Assets for all interested parties.  Moreover, the Debtor believes the rapid transition to new ownership will maximize the value of the Purchased Assets.

## Relief Requested[3]

15.     *First*, the Debtor requests entry of an order, substantially in the form attached hereto as Exhibit B (the "Bidding Procedures Order"):  (A) approving procedures (the "Bidding Procedures," the form of which is attached thereto as Exhibit 1) for (i) submitting bids for any or all of the Purchased Assets of the Debtor and (ii) conducting an auction (the "Auction") with respect to the Purchased Assets in the event the Debtor receive at least two bids; (B) scheduling the Auction for June 9, 2014 at 10:00 a.m. (Pacific) at the offices of DLA Piper LLP (US), 550 South Hope Street, Suite 2300, Los Angeles, California 90071, or at such other place, date and

---

[1]     Certain of the schedules and related documents have not been filed with this motion, but will be finalized by the Debtor and filed no later than five (5) business days after entry of the Bidding Procedures Order.

[2]     Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Purchase Agreement.

[3]     In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the transaction as currently set forth in the Purchase Agreement have been summarized and are attached hereto as Exhibit A.

time as may be designated by the Debtor; (C) scheduling a hearing to approve any sale of Purchased Assets with respect to any bid(s) accepted by the Debtor on or before June 16, 2014 (the "Sale Hearing"); (D) approving procedures (the "Cure Procedures"), as set forth below, for the assumption and assignment of certain executory contracts (the "Contracts") and unexpired leases (the "Leases") of the Debtor to any purchaser(s) of the Purchased Assets, and to resolve any objections thereto; and (E) approving (i) the form of notice of the Auction and Sale (the "Procedures Notice"), attached to the Bid Procedures Order as Exhibit 4, to be served on the Procedures Notice Parties (as defined below) and (ii) the form of notice to parties holding Contracts and Leases likely to be assumed and assigned in connection with the sale of Purchased Assets, in the form attached to the Bid Procedures Order as Exhibit 5 (the "Cure Notice").

16.    *Second*, the Debtor requests entry of an order in substantially the form attached hereto as Exhibit C (the "Sale Order"), pursuant to sections 105, 363 and 365 of the Bankruptcy Code: (i) approving the sale of the Purchased Assets of the Debtor to the purchaser (the "Sale"), free and clear of all liens, claims, encumbrances and liabilities, except as provided in the Purchase Agreement, and (ii) authorizing the Debtor to consummate the Sale and all documents, agreements and contracts executed in conjunction therewith.

## I.    PROPOSED BID AND SALE PROCEDURES

### Summary of Proposed Bidding Procedures

17.    Except as otherwise provided in the Purchase Agreement, all of the Debtor's rights, title and interest in all of the Purchased Assets shall be sold free and clear of any liens, security interests, claims, charges or encumbrances in accordance with section 363 of the Bankruptcy Code.  The Debtor proposes that any such liens, security interests, claims, charges or encumbrances shall attach to the amounts payable to the Debtor's estate resulting from the

Sale, net of any transaction fees (the "Sale Proceeds"), in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

## A.    Provisions Governing Qualifications of Bidders

18.    Unless otherwise ordered by the Court, in order to participate in the bidding process, prior to the Bid Deadline (defined below), each person who wishes to participate in the bidding process (a "Potential Bidder") must deliver the following to the Notice Parties (as defined below):

      (a)    a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid; and

      (b)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtor to a Potential Bidder) in form and substance satisfactory to the Debtor and which shall inure to the benefit of any purchaser of the Purchased Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

19.    A Potential Bidder that delivers the documents and information described above and that the Debtor determines in its reasonable business judgment, after consultation with its advisors, is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale, will be deemed a "Qualified Bidder." The Debtor will limit access to due diligence to those parties it believes, in the exercise of its reasonable judgment are pursuing the transaction in good faith.

20.    As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtor will determine and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder.

**B.    Due Diligence**

21.    The Debtor will afford any Qualified Bidder such due diligence access or additional information as the Debtor, in consultation with its advisors, deems appropriate, in its reasonable discretion.  The due diligence period shall extend through and include the Bid Deadline (as defined below).  Additional due diligence will not be provided after the Bid Deadline.

**C.    Provisions Governing Qualified Bids**

22.    A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

(a)    it states that the applicable Qualified Bidder offers to purchase, in cash, the Purchased Assets;

(b)    it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the Back-Up Bidder (defined below), provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, and (ii) the date that is fifteen (15) business days after entry of the Sale Order with respect to the Successful Bidder and sixteen (16) business days after entry of the Sale Order with respect to the Back-Up Bidder;

(c)    confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

(d)    it includes a duly authorized and executed copy of a Purchase Agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, together with copies marked ("Marked Agreement") to show any amendments and modifications to the draft of the Purchase Agreement attached as Exhibit 3 to the Bid Procedures Order and the proposed order to approve the sale by the Court;

(e)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Debtor to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Purchase Agreement;

(f)　　it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to assume and provides for the Qualified Bidder to pay related cure costs;

(g)　　it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

(h)　　it includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Purchase Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

(i)　　it includes evidence, in form and substance reasonably satisfactory to the Debtor, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Purchase Agreement;

(j)　　it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtor), certified check or such other form acceptable to the Debtor, payable to the order of the Debtor (or such other party as the Debtor may determine) in an amount equal to 10% of the Purchase Price;

(k)　　it contains such other information reasonably requested by the Debtor; and

(l)　　it is received prior to the Bid Deadline.

23.　　The Debtor shall notify in writing all Qualified Bidders that submitted a bid as to or not whether such Qualified Bidder's bid constitutes a Qualified Bid and as to whether or not there are any other Qualified Bids no later than two (2) business days following the expiration of the Bid Deadline.

**D.    Bid Deadline**

24.    A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtor: DLA Piper LLP (US), 203 N. LaSalle Street, Suite 1900, Chicago, Illinois 60601 (Attn: Kim Newmarch, Esq. (kim.newmarch@dlapiper.com)) and (ii) the Office of the United States Trustee: US Trustee, 844 King Street, Suite 2207, Lockbox #35, Wilmington, Delaware, 19899-0035 (Fax: 302-573-6497) (Attn: Mark Kenney, Esq.) (mark.kenney@usdoj.gov), so as to be received by the Debtor not later than June 2, 2014 at 9:00 a.m. (prevailing Eastern Time) (the "Bid Deadline").

**E.    Evaluation of Competing Bids**

25.    A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of such bid, (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the form of Purchase Agreement attached as Exhibit 3 to the Bid Procedures Order, and (4) any other factors deemed relevant by the Debtor in its reasonable discretion.

**F.    Only One Qualified Bid**

26.    If the Debtor receives only one Qualified Bid, the Debtor will not hold the Auction and the Qualified Bidder submitting such Qualified Bid will be named the Successful Bidder on the Bid Deadline.

**G.    Auction Process**

27.    If the Debtor receives two or more Qualified Bids, the Debtor will conduct the Auction of the Purchased Assets, which shall be transcribed at June 9, 2014 at 10:00 a.m. (prevailing Pacific Time), at the offices of DLA Piper LLP (US), 550 South Hope Street, Suite 2300, Los Angeles, California 90071, or such other location as shall be timely communicated to

-11-

all entities entitled to attend the Auction. The Auction shall run in accordance with the

following procedures:

(a)     only the Debtor, Qualified Bidders who have timely submitted a Qualified Bid, and any creditor or equity holder of the Debtor that has provided written notice to the Debtor's counsel at least five (5) business days in advance of the Auction of his, her, or its intent to attend the Auction, and their respective advisors may attend the Auction;

(b)     only Qualified Bidders who have timely submitted a Qualified Bid will be entitled to make any subsequent bids at the Auction;

(c)     each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

(d)     at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtor whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and the Back-Up Bidder (defined below) at the conclusion of the Auction. At least one (1) business day prior to the Auction, the Debtor will provide copies of the Qualified Bid or combination of Qualified Bids which the Debtor believes in its reasonable discretion is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders;

(e)     all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

(f)     the Debtor, after consultation with its advisors, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

(g)     bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "Subsequent Bid") providing a net value to the estate of at least an additional $100,000 above the prior bid. After the first round of bidding and between each subsequent round of bidding, the Debtor shall announce the bid that it believes to be the highest or

otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Qualified Bidders will not have the opportunity to pass.  Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids , the Debtor will give effect to any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtor.

**H.    Selection of Successful Bid**

28.    Prior to the conclusion of the Auction, the Debtor, in consultation with its advisors, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer from among the Qualified Bidders submitted at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and communicate to the Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid.  The determination of the Successful Bid by the Debtor at the conclusion of the Auction shall be final, subject only to approval by the Court.

29.    Unless otherwise agreed to by the Debtor and the Successful Bidder, within two (2) business days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.  Within one (1) business day following the adjournment of the Auction, the Debtor shall file a notice identifying the Successful Bidder with the Court and shall serve such notice by fax, email or overnight mail to all counterparties whose contracts are to be assumed and assigned.

30.    The Debtor will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Court at the Sale Hearing.

**I.**    **Return of Deposits**

31.    All deposits shall be returned to each bidder not selected by the Debtor as the Successful Bidder or the Back-Up Bidder (as defined below) no later than five (5) business days following the conclusion of the Auction.

**J.**    **Back-Up Bidder**

32.    If an Auction is conducted, the Qualified Bidder or Qualified Bidders with the next highest or otherwise best Qualified Bid to the Successful Bidder, as determined by the Debtor in the exercise of its business judgment, at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until sixteen (16) business days after the Sale Hearing.  Following the Sale Hearing, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court.

**K.**    **Sale Hearing**

33.    The Debtor will seek entry of an order from the Court at the Sale Hearing to begin on or before June 16, 2014, to approve and authorize the sale transaction to the Successful Bidder on terms and conditions determined in accordance with the Bid Procedures.

**Notice of Sale Hearing**

34.    As stated above, the Debtor requests that this Court schedule the Sale Hearing for June 16, 2014.  The Debtor propose that any objections to the Sale be filed by 4:00 p.m. (prevailing Eastern Time) three (3) business days prior to the Sale Hearing.

35.    The Debtor also request that the Court approve the form of the Procedures Notice, substantially in the form of Exhibit 4 to the Bid Procedures Order.  The Debtor will

serve a copy of the Procedures Notice on the following parties: (a) the US Trustee, (b) any parties requesting notices in these cases pursuant to Bankruptcy Rule 2002, and (c) all Potential Bidders (collectively with the parties specified in this paragraph, the "Procedures Notice Parties").

36.     The Debtor proposes to serve the Procedures Notice within two (2) business days following entry of the Bidding Procedures Order, by first-class mail, postage prepaid on the Procedures Notice Parties.  The Procedures Notice provides that any party that has not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a request in writing to DLA Piper LLP (US), Attn: Lindsey Wyman, 550 South Hope Street, Suite 2300, Los Angeles, CA  90071 or by emailing lindsey.wyman@dlapiper.com.

37.     The Debtor submits that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, Auction and Sale, and Sale Hearing to the Debtor's creditors and other parties in interests as well as to those who have expressed an interest or are likely to express an interest in bidding on the Purchased Assets.  Based on the foregoing, the Debtor respectfully request that this Court approve these proposed notice procedures.

## Sale Hearing

38.     At the Sale Hearing, the Debtor will seek Court approval of the Sale to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, with all liens, claims and encumbrances to attach to the Sale Proceeds with the same validity and in the same order of priority as they attached to the Purchased Assets prior to the Sale, including the assumption by the Debtor and assignment to the Successful Bidder of the Assumed Executory Contracts and Leases pursuant to section 365 of the

Bankruptcy Code.  The Debtor will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable and in the best interest of the Debtor's estate and all interested parties.

<u>**Procedures for the Assumption and Assignment of Assigned Contracts and Leases**</u>

39.     As noted above, the Debtor will seek to assume and assign certain Contracts and Leases to be identified on schedules to the Purchase Agreement other than those agreements excluded by the Successful Bidder pursuant to such bidder's Purchase Agreement (collectively, the "<u>Assumed Executory Contracts</u>").

40.     At least initially, the Assumed Executory Contracts will be those Contracts and Leases that the Debtor believes may be assumed and assigned as part of the orderly transfer of the Purchased Assets.  The Successful Bidder may choose to exclude (or to add) certain Contracts or Leases to the list of Assumed Executory Contracts, subject to further notice.

41.     In the interim, the Debtor will serve the Motion and the Cure Notice, substantially in the form of <u>Exhibit 5</u> to the Bid Procedures Order, upon each counterparty to the Assumed Executory Contracts by no later than May 19, 2014.  The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served.  The Cure Notice also will identify the amounts, if any, that the Debtor believes are owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "<u>Cure Amounts</u>").  To the extent there is a contract added to the list of contracts to be assumed by the Successful Bidder pursuant to the Successful Bidder's Purchase Agreement selected at the Auction, this Motion constitutes a separate motion to assume and assign that contract to the Successful Bidder pursuant to section 365 of the Bankruptcy Code;

each such contract will be listed on an exhibit to the Successful Bidder's Purchase Agreement, and will be given a separate Cure Notice.

42.     If a Contract or Lease is assumed and assigned pursuant to Court Order, then unless the Assumed Executory Contract counterparty properly files and serves an objection to the Cure Amount contained in the Cure Notice, the Assumed Executory Contract counterparty will receive at the time of the Closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any.  If an objection is filed by a counterparty to an Assumed Executory Contract, the Debtor proposes that such objection must set forth a specific default in the executory contract or unexpired lease, claim a specific monetary amount that differs from the amount, if any, specified by the Debtor in the Cure Notice, and set forth any reason why the counterparty believes the executory contract or unexpired lease cannot be assumed and assigned to the Successful Bidder.

43.     If any counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract (a "Assumption Objection"), the Debtor proposes that the counterparty must file the objection by no later than (i) 4:00 p.m. (prevailing Eastern Time) on June 2, 2014 or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Executory Contract if such contract is to be assumed and assigned after the Auction), provided, however, that any counterparty may raise at the Sale Hearing an objection to the assumption and assignment of the Assumed Executory Contract solely with respect to the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract.  After receipt of an Assumption Objection, the Debtor will attempt to reconcile any differences in the Cure Amount or otherwise resolve the objection with the counterparty.  In the event that the Debtor and the counterparty

cannot resolve an Assumption Objection, and the Court does not otherwise make a determination at the Sale Hearing regarding an Assumption Objection related to a Cure Amount, the Debtor may, in its discretion, segregate any disputed Cure Amounts pending the resolution of any such Cure Amount disputes by the Court or mutual agreement of the parties.

44.     The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract, and the failure to provide adequate assurance of future performance to any counterparty to any Assumed Executory Contract shall not excuse the Successful Bidder from performance of any and all of its obligations pursuant to the Successful Bidder's Purchase Agreement. The Debtor proposes that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contacts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing. Cure Amounts disputed by any counterparty will be resolved by the Court at the Sale Hearing or such later date as may be agreed to or ordered by the Court.

45.     Except to the extent otherwise provided in the Successful Bidder's Purchase Agreement, the Debtor and the Debtor's estate shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Executory Contracts pursuant to section 365(k) of the Bankruptcy Code.

## II.     APPLICABLE AUTHORITY

### A.     The Sale of the Purchased Assets is Authorized by Section 363 as a Sound Exercise of the Debtor's Business Judgment

46.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction. The Debtor has

determined that the Sale of the Purchased Assets by public auction will enable it to obtain the

highest and best offer for these assets (thereby maximizing the value of the estate) and is in the

best interests of the Debtor's creditors.

47.    Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a

standard for determining when it is appropriate for a court to authorize the use, sale or lease of

property of the estate, a sale of a debtor's assets should be authorized if a sound business

purpose exists for doing so.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 289, 295 (3d

Cir. 1996); In re Abbotts Dairies of Pennsylvania, Inc., 788 P.2d 143 (2d Cir. 1986); In re

Titusville Country Club, 128 B.R. 396 (W.D. Pa. 1991); In re Delaware & Hudson Ry. Co., 124

BR. 169, 176 D. Del. 1991); see also Official Committee of Unsecured Creditors v. The LTV

Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec.

Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Committee of

Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville

Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

48.    The paramount goal in any proposed sale of property of the estate is to maximize

the proceeds received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558,

564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the

value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a well-established

principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the

highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta

Packaging Prods., Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears

to enhance a debtor's estate, court approval of a trustee's decision to sell should only be

withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the

provisions of the Bankruptcy Code. GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd., 331

B.R. 251, 255 (N.D. Tex. 2005); In re Lajijani, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); In re

WPRV-TV, Inc., 143 B.R. 315, 319 (D. P.R. 1991) ("The trustee has ample discretion to

administer the estate, including authority to conduct public or private sales of estate property.

Courts have much discretion on whether to approve proposed sales, but the trustee's business

judgment is subject to great judicial deference.").

49.     Applying section 363, the proposed Sale of the Purchased Assets should be

approved. As set forth above, the Debtor has determined that the best method of maximizing

the recovery of the Debtor's creditors would be through the Sale of the Purchased Assets. The

fairness and reasonableness of the consideration to be paid by the purchaser(s) will be

demonstrated by adequate "market exposure" and an open and fair auction process — the best

means for establishing whether a fair and reasonable price is being paid. In order to ensure a

fair auction process, the Debtor has and will continue to solicit interest from numerous potential

purchasers.

50.     Further, the Debtor believes that the value the Debtor's estate—and, thus, the

Debtor's creditors—will receive for the Sale of the Purchased Assets exceeds any value the

Debtor's estate could get for the Purchased Assets if the Debtor were required to liquidate its

assets piecemeal. As assurance of value, bids will be tested through the Auction consistent with

the requirements of the Bankruptcy Code, the Bankruptcy Rules, and pursuant to the Bidding

Procedures approved by the Court. Consequently, the fairness and reasonableness of the

consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate

"market exposure" and an open and fair auction process — the best means, under the circumstances, for establishing whether a fair and reasonable price is being paid.

51.      The Debtor believes that the timeline for the marketing and sale of the Purchased Assets is adequate, especially considering the marketing efforts that previously occurred with respect to the Debtor's business.  In addition to the Debtor's prior efforts, since the Petition Date, the Debtor has been contacting potential interested parties and has or is working on providing them access to a data room that has been assembled upon the execution of an appropriate confidentiality agreement.  There is a limited universe of potential acquirers of the Purchased Assets, and, the Debtor and its advisors have been active discussions with most, if not all, of these potential purchasers.

**B.      The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Purchased Assets.**

52.      As noted above, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  See, e.g., In re Fin'l News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

53.      Procedures to dispose of assets, similar to the proposed Bidding Procedures, have been approved in other bankruptcy cases.  See, e.g., In re Velti Inc., Case No. 13-12878 (PJW) (Bankr. D. Del. Nov. 20, 2013); In re Orchard Supply Hardware Stores Corp., Case No. 13-11565 (CSS) (Bankr. D. Del. Jul. 8, 2013); In re Conex Holdings LLC, Case No. 11-10501

WEST\247597703.13

(CSS) (Bankr. D. Del. Sept. 14, 2011); In re Barnes Bay Dev. Ltd., Case No. 11-10792 (PJW)

(Bankr. D. Del. May 19, 2011); In re East West Resort Dev. V, L.P., L.L.L.P., Case No. 10-

10452 (BLS) (Bankr. D. Del. March 31, 2010); In re Dana Corp., Case No. 06-10354 (Bankr.

S.D.N.Y. Oct. 19, 2006); In re Delphi Corp., Case No. 05-44481 (Bankr. S.D.N.Y. June 22,

2006); In re Oxford Automotive, Inc., Case No. 04-74377 (Bankr. E.D. Mich. Jan. 24, 2005);

see also In re Calpine Corp., Case No. 05-60200 (Bankr. S.D.N.Y. Dec. 6, 2006).

54.     The Debtor believes that the Bidding Procedures will establish the parameters

under which the value of the Purchased Assets may be tested at an auction and through the

ensuing Sale Hearing.  Such procedures will increase the likelihood that the Debtor's creditors

will receive the greatest possible consideration for its assets because they will ensure a

competitive and fair bidding process.  They also allow the Debtor to undertake an auction in as

expeditious and efficient manner as possible, which the Debtor believes is essential to

maximizing the value of the Debtor's estate for its creditors.

55.     The Debtor also believes that the proposed Bidding Procedures will promote

active bidding from seriously interested parties and will dispel any doubt as to the best and

highest offer reasonably available for the Debtor's assets.  In particular, the proposed Bidding

Procedures will allow the Debtor to conduct an auction in a controlled, fair and open fashion

that will encourage participation by financially capable bidders who demonstrate the ability to

close a transaction.

56.     In sum, the Debtor believes that the Bidding Procedures will encourage bidding

for the Purchased Assets and are consistent with the relevant standards governing auction

proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the proposed

WEST\247597703.13

Bidding Procedures are reasonable, appropriate and within the Debtor's sound business judgment.

**C.    The Sale of the Purchased Assets Free and Clear of Liens and Other Interests is Authorized by Sections 363(f)**

57.    The Debtor further submits that it is appropriate to sell the Purchased Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the Sale Proceeds of the Purchased Assets to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

58.    This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

59.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets "free and clear" of liens and interests.  In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan

-23-

Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

60.     The Debtor believes that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Purchased Assets pursuant to the Purchase Agreement.  In particular, the Debtor believes that at least sections 363(f)(2) and (3) will be met in connection with the transactions proposed under the Purchase Agreement because (i) each of the parties holding liens on the Purchased Assets will consent or, absent any objection to this motion, will be deemed to have consented to the Sale, and (ii) the Purchased Assets will be sold at a price well in excess of the aggregate amount of any liens encumbering such assets.  Any lienholder also will be adequately protected by having their liens, if any, in each instance against the Debtor or its estate, attach to the Sale Proceeds ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtor may possess with respect thereto.  Accordingly, section 363(f) authorizes the transfer and conveyance of the Debtor's assets free and clear of any such claims, interests, liabilities or liens.

61.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.  Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000).  In the case of In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third

Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" Id. at 289 (citing 3 Collier on Bankruptcy 15th Ed. Rev., ¶ 363.06[1] (L. King, 15th rev. ed. 1988)).  As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited with approval and extensively by the Third Circuit in Folger, supra, the scope of section 363(f) is not limited to in rem interests.  Thus, the Third Circuit in Folger stated that Leckie held that the Debtor "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." Folger, 209 F.3d at 258 (citing Leckie, 99 F.3d at 582).

62.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes such assets free from successor liability resulting from pre-existing claims.  See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product

liability claims based on successor doctrine precluded after sale of assets free and clear); WBO

P'ship v. Virginia Dept. of Medical Assistance Servs. (In re WBO P'ship), 189 B.R. 97, 104-05

(Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an

"interest" as used in section 363(f)).[4]  The purpose of an order purporting to authorize the

transfer of assets free and clear of all "interests" would be frustrated if claimants could

thereafter use the transfer as a basis to assert claims against the purchaser arising from the

Debtor's pre-sale conduct.  Under section 363(f) of the Bankruptcy Code, the purchaser is

entitled to know that the Debtor's assets are not infected with latent claims that will be asserted

against the purchaser after the proposed transaction is completed.  Accordingly, consistent with

the above-cited case law, the order approving the Sale should state that the Successful Bidder is

not liable as a successor under any theory of successor liability, for claims that encumber or

relate to the Purchased Assets.

**D.      The Proposed Notice of Bidding Procedures and Auction Is Appropriate**

63.      The Debtor believes that it will obtain the maximum recovery for creditors of the

Debtor's estate if the Purchased Assets of the Debtor are sold through a well-advertised sale and

auction.  The Debtor has already taken significant steps to identify potential purchasers.

64.      Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify

creditors of the proposed sale of the Debtor's assets, including a disclosure of the time and place

of an auction, the terms and conditions of a sale, and the deadline for filing any objections.  The

Debtor submits that the notice procedures herein comply fully with Bankruptcy Rule 2002 and

---

4      Some courts, concluding that section 363(f) of the Bankruptcy Code does not empower them to convey
       assets free and clear of claims, have nevertheless found that section 105(a) of the Bankruptcy Code
       provides such authority.  See, e.g., Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White
       Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific
       authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is
       implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtor's creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Purchased Assets. The proposed time frame between the filing of this Motion, the commencement of the bidding process and the Auction should provide interested purchasers ample time to participate in the Auction.

**E.      Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

65.      Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a). Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

66.      Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

> (A)      the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)      adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

67.      The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate

assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

68.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

69.     The Debtor and the Successful Bidder will present evidence at the Sale Hearing to prove the financial credibility, willingness and ability of the Successful Bidder to perform under the Contracts or Leases. The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder to provide adequate assurance of future performance under the Contracts or Leases, as required by section 365(b)(1)(C) of the Bankruptcy Code.

70.     In addition, the Cure Procedures are appropriate and consistent with section 365 of the Bankruptcy Code. To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Successful Bidder's Purchase Agreement. Except as otherwise limited by section 365 of the Bankruptcy Code, any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code.

71.     Accordingly, the Debtor submits that the Cure Procedures for effectuating the assumption and assignment of the Assumed Executory Contracts as set forth herein are appropriate and should be approved.

**F.      The Successful Bidder Should be Afforded All Protections Under Section 363(m) as A Good Faith Purchaser**

72.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  In re Chateaugay Corp., 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986)); see also Allstate Ins. Co. v. Hughes, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

73.     The selection of the Successful Bidder will be the product of arm's-length, good faith negotiations in an anticipated competitive purchasing process.  The Debtor intends to

WEST\247597703.13

request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser

entitled to the protections of section 363(m) of the Bankruptcy Code.

### G.    Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

74.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order

authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the

expiration of 14 days after the entry of the order, unless the court orders otherwise."  The

Debtor requests that the Order be effective immediately by providing that the fourteen (14) day

stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

75.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient

time for an objecting party to appeal before an order can be implemented.  See Advisory

Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules

6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should

"order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier suggests

that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to

close immediately "where there has been no objection to the procedure." Collier on Bankruptcy

P 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Furthermore, Collier provides

that if an objection is filed and overruled, and the objecting party informs the court of its intent

to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.

Id.

76.    The Debtor hereby requests that the Court waive the fourteen-day stay periods

under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is

filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

### Notice

77.    Notice of this Motion has been provided to: (a) the US Trustee, (b) those parties requesting notice pursuant to Bankruptcy Rule 2002, and (c) all creditors listed in the debtor's schedules of assets and liabilities.  In light of the nature of the relief requested, the Debtor respectfully submits that no further notice of this Motion is required.

WHEREFORE, the Debtor respectfully requests that the Court enter orders substantially in the form attached hereto as Exhibit B and Exhibit C: (a) granting the relief requested herein and (b) granting to the Debtor such other and further relief as the Court may deem proper.

Dated:    April 23, 2014
          Wilmington, Delaware

Respectfully submitted,

/s/ R. Craig Martin
R. Craig Martin (5032)
Daniel N. Brogan (5723)
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  craig.martin@dlapiper.com
        daniel.brogan@dlapiper.com

-and-

Kimberly D. Newmarch (DE 4340)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516
Email:   kim.newmarch@dlapiper.com

PROPOSED ATTORNEYS FOR DEBTOR AND
DEBTOR IN POSSESSION

WEST\247597703.13