IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------------x
                                                               :
In re                                                          :  Chapter 11
                                                               :
Quantason, LLC,                                                :  Case No. 14-10932 (_____)
                                                               :
              Debtor.                                          :
                                                               :
---------------------------------------------------------------x
```

## DECLARATION OF EDMOND RAMBOD
## IN SUPPORT OF MOTION TO SHORTEN TIME REGARDING
## BIDDING PROCEDURES FOR SALE MOTION

1. I am the president and chief executive officer for Quantason, LLC ("Quantason" or the "Debtor"). I co-founded Quantason and have been employed as its president and chief executive officer since July 2009. Prior to founding Quantason, I founded BioQuantetics, Inc. and have served as its chief executive officer since April 2000. I also previously served as the chief scientific officer of National Quality Care, Inc. and as a senior scientist for the California Institute of Technology.

2. On the date hereof (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as a motion to establish bidding procedures for and approve the sale of substantially all of the Debtor's assets (the "Sale Motion") and a motion to shorten the notice and objection periods for the Sale Motion (the "Motion to Shorten"). I am authorized by the Debtors to submit this Declaration on its behalf in support of the Motion to Shorten.

3. The Sale Motion is intended to bring about the best possible return for the Debtor's creditors and other stakeholders by providing for the timely and effective disposition of the Debtor's assets. I have reviewed the Motion to Shorten and it is my belief that the relief

sought therein is necessary to (a) avoid immediate and irreparable harm to the Debtor's business; and (b) maximize and preserve the value of the Debtor's chapter 11 estate.

4. In my capacity as president and chief executive officer of Quantason, I am familiar with the Debtor's day-to-day operations, financial condition, business affairs and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge, (b) my review of relevant documents, (c) information supplied to me by other members of the Debtor's management team or professionals retained by the Debtor, or (d) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If called upon, I could and would testify competently to the facts set forth herein.

5. Part I of this Declaration provides an overview of the Debtor's business. Part II provides a description of the Debtor's current debt obligations. Part III provides a discussion of the events that compelled the commencement of this chapter 11 case, as well as the Debtor's plan for this case. Part IV affirms and incorporates the facts that support the relief requested in the Motion to Shorten.

## Part I
### Overview of the Debtor's Business

6. Quantason was incorporated in Delaware in 2009 and has its executive office in Los Angeles, California. It is a technology company focused on developing, licensing and commercializing products utilizing its proprietary Image-based Dynamic Ultrasound Spectrography ("IDUS")™ platform technology and systems for breast cancer screening and prevention. For breast screening, IDUS™ technology is being developed and investigated to utilize automated and conventional ultrasound systems and to provide real-time, non-invasive imaging, stimulating and response recording of targeted breast tissues for detection, 3-D location

and classification of high-risk lesions ("microcalcifications"), which are strong predictors of the presence of breast cancer.

7.  IDUS™ technology is designed and is being developed to enhance the 2-D and 3-D imaging capabilities of conventional ultrasound platforms by adding two important features: (i) real-time quantitative spectral analysis and (ii) 3-D positioning of microcalcifications. Quantason's objective is to develop a technology to provide an effective screening modality with higher detection sensitivity that results in an earlier finding of high-risk breast lesions.

8.  Quantason anticipates that the initial introduction of its IDUS™ technology will be in the context of

- the integration of IDUS™ technology with conventional automated ultrasound systems with hands-free scanners as well as those with hand-held transducers for breast microcalcification detection, location, classification and precision guided biopsy; and

- the development of its IDUS™ module as a plug-in device for installed-base ultrasound platforms.

9.  The IDUS™ platform technology is protected by 18 issued and pending patents and several patent applications in the pipeline, for which Quantason is either the assignee or the exclusive and perpetual licensee. In addition, Quantason has two allowed trademarks. Quantason is the sole assignee of certain intellectual property rights and an exclusive and perpetual licensee from BioQuantetics, Inc. Quantason also has trade secrets, confidential information, data and know-how which support its activities in further advancing its IDUS™ platform technology.

## Part II
### Debtor's Obligations

10. The Debtor does not currently have any secured debt or outstanding bonds. The Debtor does, however, have unsecured debts. As of the Petition Date, the Debtor estimates that it has outstanding unsecured obligations of approximately $1,174,535.11. The majority of these unsecured obligations are owed to various trade vendors and employees that provide goods and services to the Debtor and as set forth in the Debtor's schedules of assets and liabilities, certain of these obligations are contingent, disputed, or unliquidated.[1]

## Part III
### Events Leading to the Commencement of
### These Cases and the Debtor's Chapter 11 Plans and Strategies

11. As a product development stage technology company, the Debtor currently has no products approved for sale in any jurisdiction. Thus, throughout its brief history of operations, it unsurprisingly has incurred significant operating losses as it incurred costs associated with:

- designing and conducting the human pilot studies and human clinical trials which may be required to obtain clinical validation and regulatory approval for certain applications of its IDUS™ technology;

- seeking regulatory authorizations and approvals in the United States and European Union for IDUS™ technology and systems;

- further research, product development, and third-party manufacturing efforts, including sensors and sensor-retaining disposables;

- growing, prosecuting, maintaining and protecting its intellectual property;

- expanding third-party manufacturing, sales and marketing capabilities or

---

[1] On the Petition Date, the Debtor filed its schedules of assets and liabilities, along with its statement of financial affairs in this chapter 11 case. These filings are available at the Court's website, http://www.deb.uscourts.gov/.

   overseeing the compliance of outsourced activities; and

- broadening its infrastructure and operations.

12. Given these conditions, in order to remain operationally solvent, the Debtor has been dependent on periodic infusions of capital from outside investors. In its brief history, the Debtor has successfully funded its operations in this manner through two (2) rounds of financing.

13. In early 2013, the Debtor recognized the need for another round of investor financing and began pursuing such a course. To this end, the Debtor retained legal advisors with the intent of formally initiating the offering in late 2013 to raise at least $10,000,000 in an offering of its Class A and Class B Units to investors. The Debtor prepared a draft offering memorandum and was confident that the offering would raise the capital necessary for the Debtor to continue operating effectively.

14. The Debtor identified several potential institutional investors. On behalf of the Debtor, I began contacting these parties in September 2013 and continued discussions with potential investors through January 2014. In all, the Debtor had communications with approximately five (5) potential institutional investors, at least three (3) of which executed non-disclosure agreements with the Debtor and were given access to diligence materials. Others also demonstrated great interest in participating in the offering.

15. For a variety of reasons, however, the Debtor's existing unit holders could not reach agreement with respect to commencing the offering. As the Debtor's cash situation became increasing dire, the existing unit holders went so far as to participate in a mediation on February 28, 2014. When the mediation proved unsuccessful, given the Debtor's lack of cash, the Debtor was left with no alternative but to suspend its operations, terminate its employees, and, as agreed to by its unit holders following the mediation, file this chapter 11 case.

## Part IV
## Facts Relevant to Motion to Shorten

16. Concurrently with the filing of this chapter 11 case, the Debtor filed the Sale Motion, seeking to establish procedures for and the approval of the sale of substantially all of the Debtor's assets to the winning bidder of an auction-style sale process.

17. I have reviewed and discussed with Debtor's counsel the Sale Motion and incorporate by reference the factual statements set forth in the Sale Motion. It is my belief that the relief sought in the Sale Motion is critical to the Debtor's ability to achieve the best outcome for its stakeholders.

18. The sale of the Debtor's assets pursuant to the procedures and timeline proposed in the Sale Motion presents the best opportunity to maximize the value of the Debtor's assets for all interested parties and the only means by which the Debtor's technology will continue to be developed for eventual use in important breast cancer applications. The Debtor's financial situation is beyond precarious. It cannot afford an extended stay in chapter 11 and needs to sell its assets while interest for its technology in the marketplace remains high.

19. Further, the Debtor's most significant asset is technology it has developed and the patent and pending patent applications related to that technology. The Debtor has several pending patent applications, particularly those in the United States, that must be prosecuted in order to be preserved. Given the Debtor's dire financial condition, the Debtor does not have sufficient cash to continue prosecuting those patent applications. Specifically, the Debtor is in the process of prosecuting several US filed patent applications which are currently under examination by the United States Patent and Trademark Office ("USPTO"). In my fifteen years of experience in submitting and prosecuting patent applications, I expect that in the next forty-five days, the Debtor will receive at least one or more sets of questions from the USPTO that it

must respond to in a very short time period that could be as little as two weeks. In addition, the Debtor is currently facing a deadline of April 23, 2014 with respect to its application in Japan and June 2014 with respect to its applications in the European Union and Israel. Unless the Debtor is able to quickly sell its assets the pending patent applications will be lost and the value of the Debtor's assets and its ability to make payments to its stakeholders will be greatly reduced. Thus, a quick and efficient sale is critical to achieving a worthwhile result for the estate's stakeholders.

Dated: April 23, 2014
       Los Angeles, California

_____
Edmond Rambod